UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v. : | Criminal No. 24-cr-261 (RDM) |
| : | |
| OLEKSANDR DIDENKO, : | |
| : | |
| Defendant. : | |

**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**

The United States of America, by and through undersigned counsel, hereby submits this sentencing memorandum for defendant Oleksandr Didenko (hereinafter "Defendant"). The government recommends a sentence at the low end of the Defendant's sentencing guideline range, specifically 78 months on Count One, and 24 months on Count Four, which results in a sentence of 102 months. The government further recommends the court impose 36 months of supervised release, a special assessment of $200 and a money judgment in the amount of $1,420,185.64 (the total amount of payments Defendant received as a result of his participation in the scheme). The government also seeks the entry of an order of restitution in the amount of $45,687.72. This sentence reflects the seriousness of Defendant's criminal conduct and his role in the conspiracy. As explained herein, the requested sentence would adequately serve the interests of justice as codified in 18 U.S.C. § 3553(a).

**PROCEDURAL HISTORY**

On May 29, 2024, a grand jury indicted Defendant with Conspiracy to Commit Wire Fraud, in violation of 18 U.S.C. §§ 1343, 1349; (Count One); Conspiracy to Defraud the United States, in violation of 18 U.S.C. § 371 (Count Two); Conspiracy to Falsely Represent to Be a Citizen of the United States, in violation of 18 U.S.C. §§ 911 and 371 (Count Three); Aggravated Identity Theft, in violation of 18 U.S.C. § 1028A(a)(1) (Count Four); Conspiracy to Commit Fraud and

1

Related Activity in Connection with Identification Documents, in violation of 18 U.S.C. §§ 1028(a)(7), (b)(1)(D), (c)(3)(A) & (f) (Count Five); Conspiracy to Cause the Unlawful Employment of Aliens, in violation of 8 U.S.C. § 1324a(a)(1)(A) and 18 U.S.C. § 371 (Count Six); Conspiracy to Launder Monetary Instruments, in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and (h) (Count Seven); Conspiracy to Launder Monetary Instruments, in violation of 18 U.S.C. §§ 1956(a)(2)(A) and (h) (Count Eight); and Prohibition of Unlicensed Money Transmitting Business, in violation of 18 U.S.C. § 1960 (Count Nine).

On November 10, 2025, Defendant pled guilty pursuant to a Fed. R. Crim P. 11(c)(1)(B) to Counts One and Four of the Indictment. Sentencing is scheduled to take place on February 19, 2026.

## FACTUAL BACKGROUND

The relevant factual background is described in the Statement of Offense (ECF No. 26), incorporated herein by reference.

In general, since 2003, the Democratic People's Republic of Korea (North Korea) has been under sanction by the United Nations (U.N.) due to its testing and expansion of its nuclear weapons program. Since 2016, the United States has had comprehensive sanctions against North Korea, cutting it off from the U.S. financial system and limiting the ability of U.S. persons and companies to do business with North Koreans. As a result, North Korea has sponsored various subterfuge schemes to evade U.N. and U.S sanctions to earn money for the regime. One such scheme involves the use of thousands of highly skilled information technology (IT) workers to obtain remote employment with companies around the world, including the United States, using false, stolen, or borrowed identities. In order to circumvent controls put in place by U.S. companies to prevent hiring illicit overseas IT workers, the North Korean IT workers obtain assistance from persons

residing both within in and outside of the U.S.

From in and around 2018, until on or about May 10, 2024, the defendant, Oleksandr Didenko, a Ukrainian national operating from Ukraine, conspired with certain overseas IT workers, including North Korean IT workers and individuals located in the United States, to perpetuate such a coordinated scheme to obtain remote work from U.S. companies. The purpose of the scheme was to generate revenue for the overseas IT workers, their associates, the Defendant and in some instances, the North Korean regime. Specifically, the overseas IT workers, with the assistance of Defendant, stole the identities of U.S. nationals or otherwise convinced U.S. persons to loan the overseas IT workers their identities for money, and applied for remote jobs in the United States using those false identities and causing the transmission of false documentation to the Department of Homeland Security (DHS). The IT workers obtained jobs in at least 40 U.S. companies, to include Fortune 500 companies. Beginning in at least September of 2021, through up to and including May 16, 2024, Defendant ran a website using a U.S.-based domain, "Upworksell.com," for the purposes of facilitating and allowing overseas IT workers to buy or rent stolen or borrowed identities belonging to real individuals and pose as these persons on online freelance work platforms. Using these stolen or borrowed identities offered on Upworksell.com, the IT workers were able to fraudulently obtain work from companies located in countries such as the United States in which they would not otherwise be eligible to legally work. In order to perpetuate this fraud, Defendant facilitated the creation of fake documentation, to include fake passports, as well as hiring individuals to pose as the IT worker to their employer, all so that the IT worker's employer was unaware that they are being defrauded.

Through Upworksell.com, the defendant also provided access to proxy financial accounts, including online Money Service Transmitters (MSTs) to allow remote workers to receive

payments from U.S.-based employers domestically and thus give them the appearance of being located in the United States by obfuscating their true location. The defendant also utilized individuals in the United States to receive and host laptop computers and other hardware from U.S. companies at multiple residences located throughout the U.S., including Virginia, Tennessee, Arizona, and California, through which the overseas IT workers gained access to the internal systems of the U.S. companies. The defendant's overseas IT worker coconspirators were paid hundreds of thousands of dollars for their work, much of which has been falsely reported to the IRS and SSA in the name of actual U.S. persons whose identities have been false, stolen, or borrowed.

The conspiracy perpetrated a significant fraud on a multitude of industries at the expense of generally unknowing U.S. companies and persons. The coconspirators compromised the identities of at least 18 U.S. persons, creating false tax liabilities for at least 13 of these victims; defrauded at least 40 U.S. companies who either employed or initiated the employment of these overseas IT workers; and caused false information to be conveyed to DHS on at least 15 occasions.

## SENTENCING CALCULATION

### A. Statutory Maximums

**Count One:** Conspiracy to Commit Wire Fraud, in violation of 18 U.S.C. §§ 1343 and 1349, carries a maximum sentence of 20 years of imprisonment; a fine of $250,000 or twice the pecuniary gain or loss of the offense; a term of supervised release of not more than three years; mandatory restitution under § 3663A; and an obligation to pay any applicable interest or penalties on fines and restitution not timely made.

**Count Four:** Aggravated Identity Theft, in violation of 18 U.S.C. § 1028A(a)(1), carries a mandatory sentence of two years of imprisonment, that is to run consecutively to any other term

4

of imprisonment; a fine not to exceed the greater of $250,000 or twice the pecuniary gain or loss of the offense; a term of supervised release of not more than one year; mandatory restitution under § 3663A; and an obligation to pay any applicable interest or penalties on fines and restitution not timely made.

### B. Sentencing Guidelines Calculation

The government agrees with the Presentence Investigation Report (PSR), which places the defendant in Criminal History Category I. PSR at ¶ 63. The government also agrees with the Guidelines calculations in the PSR for Counts One (¶ 46-52) and Count 4 (¶ 46). The government further agrees that the defendant qualifies for a two-level role adjustment pursuant to U.S.S.G. § 3B1.1(c) (see ¶ 54), and a three-level reduction for acceptance of responsibility (see ¶ 57-58). Finally, the government agrees that the defendant's Guideline range for Count One is 78 to 97 months and for Count 4 is 24 months, which must be served consecutively to any sentence on another count, thereby resulting in an effective Guidelines range of 102 to 121 months. *Id.* at ¶ 94-95.

## SENTENCING RECOMMENDATION

A district court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). The Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark." *Id.* at 46-49. The district court should next consider all of the applicable factors set forth in 18 U.S.C. § 3553(a). *Id.* at 49-50. Indeed, the Guidelines themselves are designed to calculate sentences in a way that implements the considerations relevant to sentencing as articulated in § 3553(a). *United States v. Rita*, 551 U.S. 338, 347-50 (2007).

The § 3553(a) factors include (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed correctional treatment; (3) the Sentencing Guidelines and related Sentencing Commission policy statements; and (4) the need to avoid unwarranted sentence disparities.

The government submits that a sentence at the low end of the Guidelines range for Counts One and Four—102 months, is appropriate, taking into account all of the sentencing factors in § 3553(a), particularly the statute's mandate that the "[C]ourt shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. Such a sentence would most appropriately reflect and address the seriousness of Defendant's conduct, serve as a deterrent, and take into account the need for just punishment.

A. **The Nature and Circumstances of the Offense**

1. **Overseas and North Korea IT Worker Scheme**

The nature and circumstances of the offense are serious. The North Korea IT worker scheme uses thousands of highly skilled IT workers, who work remotely for U.S. and foreign companies, using false identities, and generate revenue that is funneled back to North Korea. The COVID-19 pandemic and the advent of 100% remote work positions in the United States have increased the number of U.S. jobs accessible to this threat group. Additionally, changes to hiring practices and to employment eligibility verification rules have resulted in easier access for North Korea IT workers to obtain employment at the largest and smallest U.S. companies. A 2024 UN Panel of Experts report estimates that the technology sector continues to be a key moneymaker for

North Korea with an estimated 3,000 North Korean IT workers abroad and another 1,000 more operating inside North Korea, generating $250-600 million annually, most of which is returned to the regime.[1] As discussed below, the Defendant appears to have had knowledge that some of his overseas remote IT workers were from North Korea. Accordingly, in addition to the significant fraudulent activities engaged in by the defendant, the national security implications of the scheme make the offense more serious in nature.

## 2. **Defendant's Role in the Scheme**

Defendant played a critical role in facilitating this conspiracy. He assisted in the procurement of stolen identifications, created accounts on freelancer job websites and MSTs to allow the overseas IT workers to procure jobs with U.S. companies and receive and make payments in U.S. dollars. Defendant also operated a website to centralize and streamline this process for his overseas IT worker customers. Defendant also oversaw multiple employees in Ukraine and the U.S. who helped him carry out the scheme. Defendant knew that the overseas IT workers were not authorized to work in the United States and that they were using false, stolen, or borrowed identities of real U.S. persons to apply for jobs. For example, on or about January 30, 2020, Defendant exchanged communications with a coconspirator customer ("Customer-1") in which Customer-1 asked Defendant to create an Overseas Platform-1 account and asked if, "Female can do video interview with some clients? I mean, she can manage the interview with her technical skills?" Defendant responded, "usually not" "they can just talk . . . you write – they answer". Later in the conversation, Defendant wrote, "we can create a second guy profile if you want. He knows English well and can help with client interviews . . . . [Y]ou will have to pay for each such

---

[1] U.N. Security Council, Final Report of the Panel of Experts submitted pursuant to Resolution 2680 (2023), U.N. Doc. S/2024/215, at 50–51 (Mar. 7, 2024), https://www.securitycouncilreport.org/atf/cf/%7B65BFCF9B-6D27-4E9C-8CD3-CF6E4FF96FF9%7D/S%202024%20215.pdf.

interview, but he is a good guy." Indictment at ¶ 24(i)(i). On or about June 2, 2023, Customer-4 wrote, "I hope to buy [U.S. MST-2] account with my name. [U.S. Person-1, the identity of a U.S. citizen] . . . .I got a job offer with [U.S. Person-1]. They need bank account with [U.S. Person-1] name." Defendant responded, "We can create [U.S. MST-2] account with your name. But we do not recommend it for use. It is not safe and we are not responsible for such an account. . . After additional discussion, Defendant wrote, "we will provide this acc asap" "and passport too." Customer-4 added, "i already bought driver licnese [sic] for 80 USD . . . and SSN with 30 USD." *Id.* at ¶ 24(i)(vi).

Defendant employed individuals in the U.S. to host laptop farms in Virginia, Tennessee, California and Arizona for his multiple overseas IT worker co-conspirators. He paid these individuals $100 per laptop per month for hosting these laptops to facilitate their fraud against the U.S. companies, employing them in order to make it appear as if the IT workers were located in the United States. In May of 2024, law enforcement seized at least 17 laptops from three residences used by the defendant at laptop farms.

Defendant also facilitated the transmission of false information to U.S. government agencies on at least 15 occasions. Furthermore, the conspiracy compromised the identities of at least 18 U.S. persons, creating false tax liabilities for at least 13 of these victims. The conspiracy also caused at least 40 U.S. companies to employ these fraudulent workers.

The Defendant received approximately $1,420,185.64 in payments into accounts he controlled as a result of the conspiracy. Defendant's conduct resulted in the transmission of numerous payments in USD through the U.S. financial system, including payments that went to North Korean IT workers.

    **3.** **<u>Victim Impact</u>**

The victim impact by this fraud is significant. This case involves a major IT worker fraud scheme charged by the Department of Justice, with at least 18 U.S. person identities stolen and 40 U.S. businesses defrauded.

The impact on U.S. persons whose identities were stolen is significant. These U.S. persons had false tax liabilities created in their name, which they will have to handle through ongoing discussions with the IRS and SSA. For instance, one U.S. person, who is mentally and physically disabled, has advised that the theft of her identity impacted her social security and food stamp benefits. The victims' identities are now flagged within the government's employment eligibility database, creating additional hassles on these victims to prove their identities when they obtain employment.

The impact on U.S. businesses is also significant. First, the fact that U.S. companies had North Korean insiders and others accessing their systems generally caused U.S. companies to have to conduct internal and costly security reviews.[2] Second, the U.S. companies lost valuable property as law enforcement was not able to recover some of the devices used in the scheme.[3] The investigation revealed that the U.S. companies paid out at least $626,000 in wages to the fraudulent IT workers during the scheme. One of the smaller victim businesses, Company A, suffered over $45,000 in losses as a result of wages paid to a fraudulent overseas IT worker, and expenses arising from onboarding this individual and hiring a replacement.[4]

### B. The History and Characteristics of the Offender

---

[2] *E.g.*, Jasper Sleet: North Korean remote IT workers' evolving tactics to infiltrate organizations, Microsoft Security Blog, *available at* https://www.microsoft.com/en-us/security/blog/2025/06/30/jasper-sleet-north-korean-remote-it-workers-evolving-tactics-to-infiltrate-organizations/ (last visited July 7, 2025) (discussing remediation steps).

[3] The government has advised victims of their right to attend sentencing, seek restitution, and make a victim impact statements, and will provide all such statements to defense and the Court prior to sentencing.

[4] Company A is seeking restitution in connection with the aforementioned losses as discussed further *infra*.

Although Defendant has no criminal history, the instant offense of conviction was not one of a single, impulsive act. Beginning at least in and around 2018, through on or about May 10, 2024, Defendant was an active member of the criminal conspiracy, completing daily actions to keep the complex scheme in operation. Defendant knew that he was committing fraud as evidenced by his participation in the procurement and use of stolen and borrowed identifications.

The Defendant also knew or should have known that some of his customers were North Korean workers. For example, between approximately in or about August 2018 and in or about May 2022, approximately 24 coconspirator overseas IT workers with U.S. MST-2 accounts based in Dandong, China, a city on the border of Shinuiju, North Korea, sent Defendant approximately 175 payments, including through wire communications in interstate commerce, in furtherance of the scheme. During a Skype chat with one of his customers on March 10, 2023, the Defendant stated, "are all of your programmers in China? Are there programmers who are in North Korea? last [sic] year I received information that some of my clients are from North Korea, I was very surprised, I thought it was impossible."

Regarding Defendant's background, the draft PSR does not indicate that he suffered any significant trauma or incidents of mental or emotional abuse in his background. The Defendant himself described his childhood as "wonderful." PSR ¶ 69. Further, although the Defendant was living in Ukraine for several years during the ongoing war with Russia, his criminal conduct in this case began well before February 2022, when the war with Russia escalated significantly. The Defendant is also well educated (PSR ¶ 82), yet chose to use his computer skills to facilitate the instant offense. The government does recognize that the Defendant's education and past history of legitimate employment is a factor indicating his ability to be a productive member of society when he eventually returns to Ukraine.

### C. The Need to Promote Respect for the Law, to Afford Adequate Deterrence, and to Protect the Public.

In order to promote respect for the law, it is necessary and appropriate to impose a meaningful sentence. The Defendant had an essential role in a complex fraud, which included raising funds for the North Korean regime. This scheme, and others like it that involve North Korean individuals fraudulently obtaining employment with U.S. companies as remote IT workers, using false, stolen, and borrowed U.S. identities, would be much more difficult to execute without individuals like the Defendant, who essentially operated a business designed to facilitate virtually all aspects of the fraudulent scheme. From posting the resumes of overseas IT workers on freelance job websites to procuring stolen identities and creating MST accounts to allow the fraudulent IT workers to receive wages and make payments, the Defendant participated in virtually every aspect of this scheme. The Defendant's location overseas makes his conduct even more dangerous, as it makes the detection of the fraud and enforcement of U.S. laws to protect the public and national security much more difficult.

A sentence that is too lenient would convey the wrong message to both North Koreans and other foreign-based facilitators that this conduct is tolerated in the U.S. and worth the risk of being caught by U.S. law enforcement. Rather, the Court should send the message that participation in these schemes and related violations of law have serious consequences so that future would-be facilitators will be adequately deterred.

### D. The Need to Avoid Unwarranted Sentencing Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct.

In general, there are few other cases in which a foreign-based facilitator has been sentenced in a scheme of this nature, primarily due to the nature of the scheme itself and the increase in fraud due to the move to online job platforms during the COVID-19 pandemic. However, the

11

government also notes that Defendant's case is one of the more significant schemes of this type ever charged by the Department of Justice, involving over 40 businesses and 18 U.S. persons whose identities were stolen. While the investigation was unable to estimate the amount of revenue generated by this scheme for the North Korean regime, the amount of the fraud against the victim companies and individuals whose identities that were stolen is believed to be significant. *Compare, e.g.*, *United States v. Chapman*, 24-cr-220 (RDM) (Related fraud case which involved 309 U.S. companies, 68 U.S. person identities stolen and $17.1 million generated for North Korean regime); Justice Department Announces Coordinated, Nationwide Actions to Combat North Korean Remote Information Technology Workers' Illicit Revenue Generation Schemes (June 30, 2025), available at https://www.justice.gov/opa/pr/justice-department-announces-coordinated-nationwide-actions-combat-north-korean-remote (last visited February 4, 2026) (discussing various cases charged in other districts, none with more than $1 million in revenue and not more than 100 companies total), and https://www.justice.gov/opa/pr/two-north-korean-nationals-and-three-facilitators-indicted-multi-year-fraudulent-remote (last visited February 4, 2026) (discussing a scheme charged in Miami, FL, with $866,255 in revenue and 64 companies). Furthermore, distinguishing the instant matter from that of the defendant in *Chapman*, Defendant's role in perpetrating the fraud was significantly more complex and central to the overall scheme in that he controlled virtually every aspect of the planning and execution of the fraudulent scheme. This Court sentenced Chapman to 102 months of imprisonment for participating in an almost identical fraudulent scheme in which she was paid only $176,850.00 for her involvement. The Defendant was paid over $1.4 million for his participation in the charged offenses. Given the significance of the fraudulent scheme and the Defendant's critical role in enabling it, a sentence of 102 months, which is at the low end of the Guideline range, is warranted.

## REQUEST FOR RESTITUTION

The government further requests that an order of restitution in the amount of $46,547.28 be entered in the name of Company A.[5] Company A provided supporting documentation establishing that it hired one of the Defendant's fraudulent overseas IT worker customers and suffered the following losses: (a) $35,863.81 paid in wages to the IT worker who did not perform any work and $859.56 in 401k matching payments; and (2) $9,823.91 in expenses to onboard the fraudulent IT worker, onboard a replacement IT worker once the fraud was discovered, and costs associated with investigative requests made of the company by the government.[6]

## CONCLUSION

Wherefore, the government recommends that Defendant be sentenced to a total of 102 months of incarceration (78 months on Count One, 24 months on Count Four (consecutive)), 36 months of supervised release, and a special assessment of $200. The government also requests a money judgment in the amount of $1,420,185.64 and an order of restitution in the amount of $46,547.28.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

*/s/ Steven Wasserman*
STEVEN B. WASSERMAN
Assistant United States Attorney
D.C. Bar #453251
National Security Section
601 D Street, N.W., Room 5-128
Washington, DC 20530
(o) 202-252-7719
Steve.wasserman@usdoj.gov

---

[5] The government will provide the name and contact information for Company A at the sentencing hearing.

[6] In the event that additional victims come forward with supportable claims for restitution prior to sentencing, the government will submit a supplemental filing.